Case: 3:20-cv-00150-TMR Doc #: 5 Filed: 04/14/20 Page: 1 of 17 PAGEID #: 96

ELECTRONICALLY FILED
COURT OF COMMON PLEAS
Monday, March 30, 2020 10:23:35 AM
CASE NUMBER: 2020 CV 00368 Docket ID: 34471917
MIKE FOLEY
CLERK OF COURTS MONTGOMERY COUNTY OHIO

IN THE COURT OF COMMON PLEAS
MONTGOMERY COUNTY, OHIO

| | | |
|---|---|---|
| CHARLES WALKER<br>6 Falcon's Nest<br>Piqua, OH 45356 | )<br>)<br>)<br>) | CASE NO. 2020 cv 00368<br><br>JUDGE: E. Gerald Parker |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| DAYTON-PHOENIX GROUP, INC.<br>1619 Kuntz Road<br>Dayton, OH, 45404-1240 | )<br>)<br>)<br>) | **JURY DEMAND ENDORSED HEREIN** |
| **Serve also:**<br>Dayton-Phoenix Group, Inc.<br>c/o CT Corporation System<br>(Stat. Agent)<br>4400 Easton Commons Way,<br>Suite 125<br>Columbus, OH 43219 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) | |
| Defendant. | )<br>) | |

Plaintiff Charles Walker, by and through undersigned counsel, as his First Amended Complaint against the Defendant, states and avers the following:

**PARTIES, JURISDICTION, & VENUE**

1. Walker is a resident of the city of Piqua, Miami County, state of Ohio.

2. Defendant DAYTON-PHOENIX GROUP, INC. ("DPG") is an Ohio-incorporated business. The events that give rise to the claims for relief in this Complaint occurred at its location at 1619 Kuntz Road, Dayton, OH, 45404-1240.

3. DPG is, and was at all times hereinafter mentioned, Plaintiff's employer within the meaning of the Age Discrimination in Employment Act of 1967 ("ADEA") 29 U.S. Code

EXHIBIT D

§ 634 et seq., Americans with Disability Act ("ADA") 42 U.S.C. § 12101, and R.C. § 4112.01(A)(2).

4. Therefore, personal jurisdiction is proper over Defendant pursuant to Ohio Revised Code §2307.382(A)(1), (3) and/or (4).

5. Venue is proper pursuant to Civ. R. 3(C)(1), (2), (3), and/or (6).

6. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

7. Within 180 days of the conduct alleged below, Walker filed a Charge of Discrimination against Defendant ("EEOC Charge") with the Equal Employment Opportunity Commission ("EEOC", Charge No. 473-2020-00627).

8. On or about February 13, 2020, the EEOC issued and mailed a Dismissal and Notice of Rights letter to Walker regarding the EEOC Charge.

9. Walker received the Dismissal and Notice of Rights from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1), which has been attached hereto as Plaintiff's Exhibit 1.

10. Walker has filed this Complaint on or before the 90-day deadline set forth in the Dismissal and Notice of Rights.

11. Walker has properly exhausted all administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

**FACTS**

12. Walker is a former employee of DPG.

13. At all times noted herein, Walker was fully qualified for his position.

14. At all times noted herein, Walker could perform the essential functions of his job, with or without a reasonable accommodation.

15. Walker is 64 years old and is disabled due to knee issues (of which DPG had notice and for which Walker took protected leave), and thus is in protected classes for his age and disabilities, respectively.

16. Walker worked for DPG, ending as a supply chain specialist, from June 1995, until DPG terminated Walker's employment on or about July 31, 2019, purportedly for performance.

17. Walker's final day of work was July 22, 2019.

18. Walker began with DPG in the summer of 1995, initially in quality control.

19. Walker began in his purchasing role in or around 1999 and had more than five different supervisors during his time in purchasing; Walker's final supervisor was Amber Swaney (materials supervisor, early 40s).

20. In or around 2016, Walker's job duties changed with the beginning of lean manufacturing; Walker slowly focused more and more on the supply-side logistics for DPG.

21. Walker then began primarily focusing on scheduling logistics for DPG.

22. Walker stayed performing this role until the string of bad tornados in Dayton, Ohio, on or about May 29, 2019.

23. Unfortunately, DPG's buildings were almost entirely destroyed by those tornados and the company had to lease extra space to make do.

24. In or around early 2017, DPG began having issues with Walker's performance, specifically with his KPI (his performance goals).

25. DPG created a new program (KPI) that had several different performance metrics in it, most of which Walker met fully.

26. Walker did not, however, meet his goals for cost reductions and a few other minor metrics (e.g. press releases and the like).

27. The primary reason for Walker missing the metrics was not his fault, however. This actually fell on Tony Williams' (supply chain specialist, age 56) shoulders.

28. Unfortunately, Williams was quite ill around that time, he had had, upon information and belief, congestive heart failure, causing him to miss a lot of work.

29. Walker, due to Williams' absences, had to fill in for Williams' missed work resulting in Walker having trouble meeting his metrics.

30. Walker mentioned this to Swaney regarding his performance metrics, but DPG did not particularly care that Walker was effectively filling two roles at once.

31. In or around early 2018 when DPG began giving raises to its employees, Walker received only a 1% raise while other employees received between 2.5%-5%, including everyone else in Walker's group.

32. Walker was told his lower raise was purportedly due to him not meeting his KPI and because he was already making more than most others in his group.

33. In or around late 2018, Walker took a community college course on Microsoft Excel at DPG's request, though had some issues due to his medical leave.

34. In or around November 2018, Walker had to have surgical knee replacement and Larry Dorn (senior buyer, age 68) helped alleviate some of the work while Walker was out.

35. On or about January 22, 2019, Walker returned to work after his knee replacement.

36. Shortly after Walker returned, in or around early February 2019, he had another performance evaluation and was passed over for a raise entirely.

37. Walker was told that the reason was again because he made too much money in comparison to his coworkers.

38. Roughly two weeks after the denial of Walker's raise, he was called into the office to meet with Swaney and Kendra Shultz (material manager, age 50).

39. In that meeting, Walker was given a performance improvement plan ("PIP").

40. Evidently, DPG has a policy where employees who do not receive raises two years in a row are automatically placed on PIPs, which was a catch-22 for Walker as he was explicitly not given a raise for his high pay rate already.

41. Swaney noted she disagreed with the issuance of the PIP and Schultz seemed not terribly happy about it as well, but they said that HR (specifically, Tiffany Baker, early 40s) forced the PIP anyway.

42. Both Swaney and Schultz apologized to Walker for the PIP and noted he was performing well in his role.

43. In or around early February 2019, Williams discussed his doctor's desired 6-8 week sick leave to help improve his heart condition.

44. There were evidently some issues with Williams' documentation, and DPG alleged that Williams had falsified his records and thus his employment would be terminated as a result.

45. Williams disproved the allegation and refused a PIP to replace it, upon information and belief.

46. Eventually Williams was given a severance package to quietly leave DPG, upon information and belief.

47. Walker is unaware of any of the specifics of the severance, as Williams would not discuss it with him. Williams left DPG in or around mid-February 2019.

48. On or about March 3, 2019, Tiffany Baker came to Walker's location to meet with him, Swaney, and Schultz about his PIP.

5

49. In the meeting, Walker was told his progress was overall good and there was little negative to say about his performance.

50. The following PIP meetings on or about April 3 and May 3, 2019 ran roughly the same.

51. The PIP was to complete on or about June 3, 2019, but unfortunately, the tornados hit DPG prior to the PIP's end date.

52. On or about May 29, 2019, the tornados hit Dayton.

53. Roughly 75% of DPG's campus was destroyed but the remaining amount was salvageable.

54. DPG reinforced the remaining area of the campus and leased out around 300,000 sq. ft. in land north of the plant to continue production and had to hire other companies to perform some of its other work.

55. From this point until Walker's termination, he primarily helped DPG continue production as much as possible despite the tornado damage.

56. On or about June 10, 2019 Walker went on vacation; he returned on or about June 19, 2019.

57. Walker's workstation was moved to a construction trailer near the damaged plant and Dorn was helping more at DPG.

58. Walker and Dorn focused on outsourcing DPG's logistics work but faced chaos nearly every day at work because of the remaining damage to the plant and the fallout as a result.

59. Walker's work requirements were changing on a nearly-hourly basis.

60. Dorn began to grow concerned about DPG's production, his continued employment, and the potential of being scapegoated for the chaos after the tornados, and so put in his retirement on or about July 1, 2019.

61. During the week of July 15, 2019, DPG began placing more focus on the outsourced work port-tornados.

62. The prime issue in Walker's opinion, however, was that DPG's customers were upset due to the slowed production.

63. Walker and Schultz had two disagreements that week, the first revolving around Dorn's retirement date and Walker's already-planned vacation and the second that Walker had also requested off July 15, 2019 (he had texted Swaney on the 12th about being off on the 15th).

64. Dorn had set his final day of work as July 25, 2019 (a Thursday) and Walker was to begin his vacation on or about July 26 and return on August 6, 2019.

65. Walker had first requested those vacation days back in February 2019 and Swaney had approved and calendared the time off in or around April 2019.

66. Dorn had emailed DPG noting this final day and Walker had followed up the email reiterating the vacation.

67. Schultz emailed Walker noting that she felt Walker was purposefully scheduling his vacation to harm DPG's business.

68. Walker denied this, noting that he had scheduled it in February and it had been approved in April.

69. The issue escalated further, Schultz placed blame on Walker for the outsourced mainframe machine work, asking why they didn't yet have the parts and implying it was entirely Walker's fault.

70. The conversation continued into text messages and through the end of Walker's employment.

71. Swaney, notably, had placed the order with the supplier, but the parts were still being machined at that time.

72. When Walker texted Swaney on or about July 12, 2019 reiterating his upcoming vacation, he also tried to get more information on the parts that had not yet been completed.

73. Walker did not know the information as it was happening in another facility.

74. Matt Baker (shipping and receiving, mid-40s) had told Walker that all of the parts had arrived, but apparently some were missing.

75. Despite Matt Baker's fault in this issue, Swaney seemed to place blame entirely on Walker.

76. On or about July 19, 2019, Swaney texted Walker noting she had now caught up regarding the parts issue above and mentioned that DPG would be changing Walker's job schedule soon; Walker would be at the north plant Mondays, Wednesdays, and Fridays, and would be in the trailer Tuesdays and Thursdays.

77. Walker texted back noting Dorn's impending retirement and asked if the altered schedule would be best at that time.

78. Swaney said to continue working with Dorn in the trailer until Walker returned from his scheduled vacation.

79. On or about July 22, 2019 just before his shift started, Walker received a text from Swaney noting that she happened to be at his location, so Walker went to park near the conference room at the back of the parking lot to meet with her.

80. Walker then met with Swaney, Tiffany Baker, and Christy Fox (minority owner).

81. Fox told Walker that DPG was terminating his employment effective July 31, 2019, citing that Walker was not "getting things done as quickly" as needed and that they thought Walker was a problem (effectively citing Walker's performance).

82. Walker began to defend his production but stopped mid-sentence and asked Fox if anything he said in response mattered or could stop his termination. Fox said the termination was happening regardless.

83. Walker's termination was sudden. He had been consistently told that his performance was positive up until his termination meeting, where he was fired for his performance.

84. While Walker did have a PIP, he was explicitly told that he actually was indeed performing well and that his bosses disagreed with issuing it in the first place.

85. It seems the true motivating factor for Walker's termination was that he was more costly than his coworkers, a frequent pretextual basis for firing older and disabled employees, particularly when it comes to self-insured companies (DPG is self-insured, upon information and belief).

86. DPG had repeatedly told Walker that he was effectively too expensive as an employee (as the basis for not giving him any raises), something that comes with long-time employment and age.

87. DPG is a self-insured company and Walker was disabled.

88. This means that Walker's healthcare expenses were higher than most other employees (also due to his age), and thus he was even more expensive to DPG than most others.

89. In or around late 2018 into early 2019, Walker took short-term disability leave.

90. Within only a few months of his protected leave, DPG terminated Walker's employment with pretextual reasoning.

91. Defendant's termination of Walker was an adverse employment action against him.

92. Defendant's purported reason for Walker's termination is pretextual.

93. Defendant actually terminated Walker's employment discriminatorily against his age, disability, and/or in retaliation for his usage of protected leave.

94. As a result of DPG's acts and omissions, Walker has suffered damages.

### COUNT I: AGE DISCRIMINATION IN VIOLATION OF R.C. §4112, et seq.

95. Walker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

96. Walker is 65 years old, and thus is in a protected class for his age.

97. R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's age.

98. Defendant treated Walker differently than other similarly situated employees based upon his age.

99. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Walker differently from other similarly situated employees outside his protected class.

100. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Walker's age.

101. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Walker's age.

102. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by terminating Walker's employment because of his age.

103. Walker incurred emotional distress damages as a result of Defendant's conduct described herein.

104. As a direct and proximate result of Defendant's acts and omissions, Walker has suffered and will continue to suffer damages.

## COUNT II: AGE DISCRIMINATION IN VIOLATION OF THE ADEA

105. Walker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

106. Walker is 65 years old, and thus is in a protected class for his age.

107. R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's age.

108. Defendant treated Walker differently than other similarly situated employees based upon his age.

109. Defendant violated the ADEA by treating Walker differently from other similarly situated employees outside his protected class.

110. Defendant violated the ADEA by applying their employment policies in a disparate manner based on Walker's age.

111. Defendant violated the ADEA by applying their disciplinary policies in a disparate manner based on Walker's age.

112. Defendant violated the ADEA by terminating Walker's employment.

113. Defendant's purported reason for Walker's termination was pretextual.

114. Defendant actually terminated Walker's employment because of his age.

115. Defendant violated the ADEA by terminating Walker's employment because of his age.

116. Walker incurred emotional distress damages as a result of Defendant's conduct described herein.

117. As a direct and proximate result of Defendant's acts and omissions, Walker has suffered and will continue to suffer damages.

**COUNT III: DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112, et seq.**

118. Walker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

119. Walker filed a Worker's Compensation claim for heat exhaustion, and thus is in a protected class for his disability.

120. R.C. § 4112 et seq. provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability.

121. Defendant treated Walker differently than other similarly situated employees based upon his disability.

122. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by treating Walker differently from other similarly situated employees outside his protected class.

123. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their employment policies in a disparate manner based on Walker's disability.

124. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by applying their disciplinary policies in a disparate manner based on Walker's disability.

125. Defendant violated R.C. § 4112.02 and R.C. § 4112.99 by terminating Walker's employment because of his disability.

126. Walker incurred emotional distress damages as a result of Defendant's conduct described herein.

127. As a direct and proximate result of Defendant's acts and omissions, Walker has suffered and will continue to suffer damages.

**COUNT IV: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA**

128. Walker restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

129. Walker was a member of a statutorily-protected class under the ADA due to his disabilities.

130. Walker was fully qualified for his position and employment with Defendant.

131. Defendant was aware Walker was disabled under the ADA.

132. In the alternative, Defendant perceived Walker as disabled under the ADA.

133. Walker's disabilities substantially impaired one or more major life activities under the ADA.

134. Despite his disabling conditions, Walker was still able to perform the essential functions of his job, with or without a reasonable accommodation.

135. The ADA provides that it is an unlawful discriminatory practice for an employer to discriminate against an employee on the basis of the employee's disability.

136. Defendant treated Walker differently than other similarly situated employees based upon his disabilities.

137. Defendant violated the ADA by treating Walker differently from other similarly situated, able-bodied employees.

138. Defendant violated the ADA by targeting Walker for termination because of his disabilities.

139. Defendant violated the ADA by applying their employment policies in a disparate manner based on Walker's disabilities.

140. Defendant violated the ADA by applying their disciplinary policies in a disparate manner based on Walker's disabilities.

141. Defendant violated the ADA by discriminating against and terminating Walker based on his disabilities.

142. Upon information and belief, Defendant replaced Walker with a person who was outside Walker's protected class under the ADA.

143. Defendant's purported reason for Walker's termination was pretextual.

144. Defendant actually terminated Walker's employment due to his actual or perceived disabilities.

145. Defendant violated the ADA by terminating Walker because of his actual and/or perceived disabilities.

146. Walker incurred emotional distress damages as a result of Defendant's conduct described herein.

147. As a direct and proximate cause of Defendant's conduct, Walker has suffered and will continue to suffer damages.

## COUNT V: RETALIATION

148. Walker restates each and every prior paragraph of this complaint, as if it were fully restated herein.

149. As a result of the Defendant's policies and his health issues, Walker took protected short-term disability leave.

150. Subsequent to Walker's use of protected leave, Defendant took adverse employment actions against Walker.

151. Defendant's actions were retaliatory in nature based on Walker's use of the protected leave.

152. Pursuant to the ADEA, the ADA, and R.C. § 4112 et seq, it is an unlawful act to retaliate against those who enact protected activities.

153. Walker incurred emotional distress damages as a result of Defendant's conduct described herein.

154. As a direct and proximate result of Defendant's acts and omissions, Walker has suffered and will continue to suffer damages.

**DEMAND FOR RELIEF**

WHEREFORE, Walker demands from Defendant the following:

a) Issue a permanent injunction:
   i. Requiring Defendant to abolish discrimination, harassment, and retaliation;
   ii. Requiring allocation of significant funding and trained staff to implement all changes within two years;
   iii. Requiring removal or demotion of all supervisors who have engaged in discrimination, harassment, or retaliation, and failed to meet their legal responsibility to promptly investigate complaints and/or take effective action to stop and deter prohibited personnel practices against employees;
   iv. Creating a process for the prompt investigation of discrimination, harassment, or retaliation complaints; and
   v. Requiring mandatory and effective training for all employees and supervisors on discrimination, harassment, and retaliation issues, investigations, and appropriate corrective actions;

b) Issue an order requiring Defendant to expunge his personnel file of all negative documentation;

c) An award against Defendant for compensatory and monetary damages to compensate Walker for physical injury, physical sickness, lost wages, emotional distress, and other

consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

d) An award of punitive damages against Defendant in an amount in excess of $25,000;

e) An award of reasonable attorneys' fees and non-taxable costs for Walker's claims as allowable under law;

f) An award of the taxable costs of this action; and

g) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ Matthew G. Bruce_____
Matthew Bruce (0083769)
    Trial Attorney
Evan R. McFarland (0096953)
**THE SPITZ LAW FIRM, LLC**
8354 Princeton-Glendale Rd., Suite 203,
West Chester, OH 45069
Phone: (216) 291-4744 (x173)
Fax:   (216) 291-5744
Email: Evan.McFarland@SpitzLawFirm.com
Email: Matthew.Bruce@spitzlawfirm.com

*Attorneys for Plaintiff Charles Walker*

## JURY DEMAND

Plaintiff Charles Walker demands a trial by jury by the maximum number of jurors permitted.

/s/ Matthew G. Bruce_____

Matthew Bruce (0083769)